UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
HUGH MCGOWAN,                                    :
                        Plaintiff,              :
                                                 :          **OPINION AND ORDER**
         -against-                         :          07 -CV- 2252 (DLI) (SMG)
                                                 :
MICHAEL J. ASTRUE,[1]                            :
Commissioner of Social Security,                 :
                                                 :
                Defendant.              :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

       Plaintiff Hugh McGowan filed an application for disability insurance benefits ("DIB")

under the Social Security Act (the "Act") on August 9, 2004, alleging disability resulting from

coronary artery disease ("CAD"), from July 10, 2001. Plaintiff's application was denied initially

and on reconsideration. Plaintiff testified, by video conference, at a hearing held before an

Administrative Law Judge ("ALJ") on September 8, 2006. By a decision dated September 26, 2006,

the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On March 30,

2007, the ALJ's decision became the Commissioner's final decision when the Appeals Council

denied plaintiff's request for review. Plaintiff filed the instant action seeking judicial review of the

denial of benefits, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves for judgment on

the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of his denial of benefits. The

Commissioner urges the court to affirm his decision because "substantial evidence of record

supports the findings that plaintiff's alleged impairments did not prevent him from engaging in

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo
Anne B. Barnhart as the defendant in this action.

1

substantial gainful activity, and the correct legal standards were applied." (Def.'s Mem. of Law in Supp. of His Mot. for J. on the Pleadings (Doc. 9) at 2.) Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision and remand for the calculation of benefits. Plaintiff also asks for attorney's fees pursuant to 42 U.S.C. § 406(b) and 28 U.S.C. § 2412(d). Alternatively, plaintiff asks the court to remand for further administrative proceedings.

For the reasons set forth more fully below, the Commissioner's motion is denied. The court finds that the ALJ failed to adequately develop the record when weighing the opinion of the treating physician. Furthermore, the ALJ provides no sound reason to conclude that plaintiff's testimony about his symptoms is "not entirely credible." (Admin. Tr. at 19.) Finally, the ALJ applied the improper legal standard when concluding that plaintiff could perform his past relevant work as a police lieutenant responsible for hostage negotiations. As such, plaintiff's cross motion is granted to the extent that this case is remanded to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

### A.    Non-medical and Testimonial Evidence

Plaintiff is sixty-six years old. (*Id*. at 65.) From October 1968 to July 2001, he served in the New York City Police Department ("NYPD"), starting as a police officer and retiring as a lieutenant. (*Id*. at 80, 88.) For thirteen years, he was in charge of a hostage negotiation team. (*Id*. at 278-79.) The team consisted of two full-time detectives. As needed, plaintiff would request hostage negotiators. (*Id*. at 279.) His job required plaintiff to respond rapidly to hostage situations. (*Id*. at 280.) Once he arrived at the scene, he coordinated and supervised the negotiators and

tactical units. (*Id*. at 281.) He was required to lift and carry police equipment such as bullet proof vests, helmets, portable radios, and firearms. (*Id*. at 80.) This equipment often weighed approximately twenty-five pounds and occasionally weighed about fifty pounds. (*Id*.) According to plaintiff, the job required him to walk for about one hour, stand for about three hours, and sit for about two hours. (*Id*. at 72, 80.) Plaintiff wrote his own incident reports by hand. (*Id*. at 279.) He did not have a secretary or any other administrative staff. (*Id*.) His duties sometimes required him to confer with other agencies to plan for contingencies and train hostage negotiators. (*Id*. at 281.)

Plaintiff stopped working in June 2001 because of chest pains and shortness of breath. (*Id*. at 79, 281-82.) He claimed that he did not have the stamina to continue his job. (*Id*. at 282.) He was too weak to carry the bullet proof vests or helmets, and was unable to do any heavy lifting, standing, or squatting for long periods of time. (*Id*. at 103, 289.)

When he applied for disability benefits, plaintiff was able to take care of his personal needs, but doing so "cause[d] fatigue, pain and discomfort and [wa]s very time consuming." (*Id*. at 113.) He only was able to do simple household repairs such as replacing a light bulb and sweeping the front and back steps, but required assistance with holding the step stool or when sweeping and raking leaves. (*Id*. at 101.) Each day, he reads, watches television, and builds model airplanes. (*Id*. at 102.) He naps everyday before dinner. (*Id*. at 284.) He shops for clothing and medication in stores, by phone, by mail, and through the internet. (*Id*.) When he occasionally accompanies his wife to go shopping, he stays in the car. (*Id*. at 285.)

Once or twice a week, he prepares simple meals for himself, such as soups, sandwiches, and cereal. (*Id*. at 100.) His wife takes care of the grocery shopping, family finances, as well as most of the chores. (*Id*. at 285-86.) He is still able to drive and take public transportation. (*Id*. at 101.)

Two or three times a week, plaintiff walks for a quarter-mile. (*Id*. at 99, 283, 287.) He testified that fatigue and dizziness prevents him from taking longer walks. (*Id*. at 288.)

With respect to his social life, on a daily basis, he communicates with his family and friends either in person, by phone, or though e-mail. (*Id*. at 103.) Additionally, he attends church, social groups, and meetings weekly. (*Id*.) His four children visit him frequently and occasionally, they go out to a restaurant. (*Id*. at 287.)

In 2004, plaintiff completed a doctorate degree. (*Id*. at 285.) Plaintiff completed most of his thesis and turned in a first draft while he was still with the NYPD. He completed all of his coursework by 1995. (*Id*. at 285-86.) After he left the NYPD, the only remaining work was revising and incorporating comments into his thesis. (*Id*.) In 2005, he did some consulting work by mail, reviewing and editing lesson plans for the Public Agency Training Counsel. (*Id*. at 293.)

**B. Medical Evidence**

Starting in early 2001, plaintiff began experiencing nocturnal chest discomfort. (*Id*. at 188.) Once or twice a week, the discomfort woke him from his sleep. (*Id*.) The discomfort abated after ten to fifteen minutes. (*Id*.) On May 24, 2001, plaintiff underwent an echocardiogram and stress test, which revealed mild fibrocalcific disease of the aortic valve and roots, but no aortic stenosis. (*Id*. at 147.) The test revealed reversible defects consistent with exercised-induced ischemia. (*Id*. at 148.)

On June 25, 2001, plaintiff visited Dr. Marrick Kukin, the Director of the Heart Failure Program at Mt. Sinai Hospital. Dr. Kukin is board certified in internal medicine with a subspecialty in cardiology and later served as the Director for the Heart Failure Programs at St. Luke's Roosevelt Hospitals. (*Id*. at 188, 255.) Dr. Kukin concluded that plaintiff probably had coronary artery

disease and recommended cardiac catherization as soon as possible. (*Id*. at 188.)

Plaintiff underwent a cardiac catherization on July 2, 2001. (*Id*. at 175-79.) On October 19, 2001, plaintiff took a treadmill exercise gated stress test at Mt. Sinai Hospital. (*Id*. at 173-74.) The test revealed severe and extensive apical, anteroseptal, and inferoposterior ischemia with accompanying chest pain. (*Id*.) Plaintiff was admitted to Mt. Sinai Medical Center that same day for acute coronary syndrome, and on October 24, 2001, underwent a triple coronary heart bypass. (*Id*. at 231-47.) Plaintiff was discharged on October 29, 2001, "having recovered well from his coronary surgery." (*Id*. at 235.) His discharge report indicated that he "was quick to improve with ambulation and was capable of ambulating over 200 feet by the time of his discharge." (*Id*.) On September 19, 2002, plaintiff underwent another treadmill exercise gated stress test. (*Id*. at 162.) The test revealed mild abnormalities consistent with mild anteroapical ischemia although there was no longer evidence of extensive ischemia. (*Id*.)

On February 3, 2005, Dr. Jerome Caiati performed a consultative examination of plaintiff for the Social Security Administration ("SSA"). (*Id*. at 194-214.) Dr. Caiati specializes in internal medicine but it is unknown what his qualifications are for cardiology. According to his medical report, plaintiff can cook, clean, shop, do laundry, shower, bathe, dress, watch television, listen to the radio, read, attend church, and socialize with friends. (*Id*. at 194.) Dr. Caiati does not note the amount of effort required by plaintiff to do these activities or the frequency with which plaintiff engages in these activities. (*Id*.) Dr. Caiati observed that: plaintiff appeared to be in no acute distress; had normal gait; can walk on heels and toes without difficulty; and could get on and off of the examination table without difficulty. (*Id*. at 195.) Dr. Caiati conducted a treadmill exercise test, which had to be terminated after three minutes because plaintiff's legs became tired. (*Id*. at 196.)

Dr. Caiati ruled that the test was "nondiagnostic," but found that the test was negative for ischemia or arrhythmia. (*Id.*) He concluded that plaintiff's sitting, standing, walking, pushing, pulling, lifting, reaching, climbing, and bending was "unrestricted." (*Id.* at 197.)

On February 26, 2005, Al Grazia, a medical consultant, conducted a physical residual functional capacity assessment of plaintiff. (*Id.* at 216-221.) There is nothing in any of the submissions indicating that Al Grazia is a doctor and according to plaintiff, there are no licensed physicians in New York by that name. (Mem. of Law in Supp. of Pl.'s Cross-Mot. (Doc. 11) at 9.) In making the assessment, the consultant relied on Dr. Caiati's treadmill test, but he did not have any files from Dr. Kukin, plaintiff's treating physician. (Admin. Tr. at 217, 220.) The consultant concluded that plaintiff's condition limited him to occasionally lifting about twenty pounds and frequently lifting about ten pounds. (*Id.* at 217.) In an eight-hour work day, the consultant found that plaintiff can stand or walk for about six hours with normal breaks, and sit for about six hours with normal breaks. (*Id.*) The consultant believed that plaintiff's capacity to push or pull was "unlimited." (*Id.*) The consultant's report noted that plaintiff claimed to suffer from heart disease, but considered the allegations only "partially credible." (*Id.* at 219.) According to the assessment, plaintiff was capable of doing light work, which is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).[2]

On March 15, 2006, Dr. Sui-Sun Yao performed a stress exercise test on plaintiff. (*Id*. at 248.) The test ended after nine minutes and twenty seconds because of generalized fatigue. (*Id*.) Dr. Yao noted that plaintiff had no chest discomfort or other angial symptoms during test, and the test did not reveal any perfusion abnormalities. (*Id*.) Based on the test results, Dr. Yao concluded that: (1) the clinical response was nonischemic; (2) the perfusion is normal; (3) the ECG response was equivocal; and (4) the gated function was normal. (*Id*.)

On July 28, 2006, Dr. Kukin provided his assessment of plaintiff's ability to do sedentary work. (*Id*. at 251-52.) Dr. Kukin had been plaintiff's treating physician since July 2001, examining him about every four to six months. Dr. Kukin's clinical finding states that plaintiff had no ischemia. (*Id*. at 252.) According to his assessment, however, plaintiff can stand or walk less than two hours, and sit for less than four hours during an eight-hour work day. (*Id*.) Plaintiff can lift or carry less than five pounds for approximately two hours and forty minutes during an eight-hour workday. (*Id*. at 251.) Through the day, plaintiff requires bed rest and frequent breaks. (*Id*. at 252.) On August 16, 2006, Dr. Kukin classified plaintiff as Class II on the New York Heart Association ("NYHA") Functional Classification Chart. (*Id*. at 255.) According to the ALJ, Class II refers to patients "with cardiac disease resulting in slight limitation of physical activity. They are

---

[2] Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

comfortable at rest." (*Id*. at 18.) Plaintiff cites to a different NYHA definition that includes an additional sentence indicating that for Class II patients, "[o]rdinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." (Doc. 11 at 17.)

## DISCUSSION

### A.     Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court reviewing the final determination of the Commissioner must determine whether the ALJ applied the correct legal standards and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair

hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

**B.      Disability Claims**

In order to receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence that the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b).

Second, the ALJ considers whether the claimant has a "severe impairment" without reference to age, education, or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[3] *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

**C.    ALJ's Decision**

The ALJ applied the five-step analysis set forth in 20 C.F.R. § 416.920. She resolved step one in Plaintiff's favor as he has not performed substantial gainful activity since the onset of the alleged disability. (Admin. Tr. at 17.) At step two, the ALJ found that plaintiff's heart conditions "have resulted in more than slight limitations of the claimant's ability to engage in work-related activities on a sustained, remunerative basis." (*Id*.) The ALJ resolved step three against plaintiff, finding that his impairments did not meet or medically equal one of the impairments in Appendix 1 of 20 C.F.R. § 404.1520(d). (*Id*.)

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

With respect to plaintiff's residual functional capacity, the ALJ found that plaintiff remained capable of doing light work. (*Id*. at 19.) The ALJ ruled that having the capacity to do light work meant that plaintiff could perform his past relevant work as a police lieutenant. The ALJ's sole reason for reaching this conclusion is that, according to the Dictionary of Occupational Titles ("DOT"), the job of a police lieutenant "is generally performed within the light exertional level within the national economy." (*Id*.) The ALJ cites to DOT job descriptions for police lieutenants responsible for community relations and police lieutenants responsible for patrols. (*Id*.)

In making this assessment, the ALJ relied on medical opinions, objective clinical medical evidence, and plaintiff's day-to-day activities. The ALJ found that the consultative examination of Dr. Caiati and the conclusions of the state medical consultant are "generally consistent" with the conclusion that plaintiff could perform light work. (*Id*. at 18.) The ALJ also found that the "objective clinical medical evidence is in no way compatible with contentions of substantial functional compromise of a cardiac nature." (*Id*.) With respect to plaintiff's day-to-day activities, the ALJ found that plaintiff is "fully independent in all aspects of his self-care, he goes out to church services and to restaurants, and socializes with family friends and members." (*Id*.) The ALJ also noted that plaintiff completed his thesis in 2004 and edits coursework in criminal justice. (*Id*.) The ALJ found that "[s]uch a level of activity is inconsistent with assertions of total disability." (*Id*.)

The ALJ largely discounted the opinion of the treating physician and plaintiff's testimony about his symptoms. With respect to the former, the ALJ ruled that "[n]o significant probative weight can be accorded to Dr. Kukin's assessment of the claimant having a less than a sedentary residual functional capacity." (*Id*. at 18.) She provided three reasons for reaching this conclusion:

(1) Dr. Kukin's "assessment is contradicted by [his] own categorization of the claimant as being NYHA Class II[,]" which describes "patients with slight or mild limitation of activity, they are comfortable with rest or light exertion."; (2) the results of Dr. Caiati's February 3, 2005 consultative examination were inconsistent with Dr. Kukin's assessments; and (3) the results of Dr. Yao's March 15, 2006 stress test also contradicted Dr. Kukin's conclusions. (*Id.*) With respect to plaintiff's testimony about his symptoms, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of the symptoms are not entirely credible." (*Id.* at 18-19.)

**D. Application**

The Commissioner moves for judgment on the pleadings, seeking affirmation of his denial of benefits on the grounds that the ALJ applied the correct legal standards to determine that plaintiff was not disabled, and the factual findings are supported by substantial evidence. Plaintiff opposes the motion and cross-moves for judgment on the pleading on the grounds that Dr. Kukin's opinion should be accorded controlling weight and the ALJ failed to properly credit plaintiff's subjective complaints. The court finds that the ALJ failed to sufficiently develop the record before disregarding the opinion of Dr. Kukin. With respect to plaintiff's testimony about his symptoms, the ALJ did not explain why she found it "not entirely credible." Furthermore, the court finds no basis in the record for rejecting that testimony. Finally, the ALJ incorrectly concluded that plaintiff could perform his past relevant work as a police lieutenant responsible for hostage negotiations by looking at the general exertional requirements for police lieutenants responsible for community relations and overseeing patrol activities.

### 1.    Failure to Develop the Administrative Record

The primary dispute before the court involves the conflicting opinions of plaintiff's treating physician, Dr. Kukin, who deemed plaintiff disabled, and the opinions of the consulting medical examiners: Dr. Caiati, Dr. Yao, and the medical consultant, identified only as Al Grazia, who deemed plaintiff capable of performing light work.

A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (citing 20 C.F.R. 404.1527(d)).  When a treating source's opinion is not given controlling weight, the proper weight accorded depends upon several factors, including:  "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)).  Additionally, the ALJ must always "give good reasons" for the weight accorded to a treating source's medical opinion.  *Id*.  There are, however, certain decisions reserved to the Commissioner.  Such decisions include the determination that a claimant is "disabled" or "unable to work."  20 C.F.R. § 404.1527(e)(1).  "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

When evaluating conflicting opinions between the treating and consulting sources, the Second Circuit has repeatedly instructed that the "consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (citations omitted); *see also Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (citations omitted); *Bluvband v. Heckler*, 730 F.2d 886, 893-94 (2d Cir. 1984). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz*, 912 F.2d at 13 (citations omitted). Additionally, consultative reports often ignore or give only passing consideration to subjective symptoms without stated reasons. *Id*. "The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence." *Simmons*, 982 F.2d at 55 (citations omitted).

In order to resolve a conflict between medical opinions, ALJs must "investigate the facts and develop the arguments both for and against granting benefits . . . ." *Sims v. Apfel*, 530 U.S. 103, 110 (2000). ALJs must compile a claimant's "complete medical history" and make "every reasonable effort" to help obtain the necessary medical reports. 20 C.F.R. § 404.1512(d). Reasonable efforts include an initial request for records and, if not received, one follow-up request. 20 C.F.R. § 404.1512(d)(1). If the evidence received is insufficient, ALJs must contact medical sources for additional information. 20 C.F.R. § 404.1512(e). This responsibility is particularly important with respect to the medical records of a treating physician. *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999.) The ALJ must contact the treating physicians to seek "additional evidence or clarification" regarding any conflict, ambiguity, or lack of clinical or diagnostic

support. 20 C.F.R. § 404.1512(e)(1). The only exception to this requirement is when it is "know[n] from past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R. § 404.1512(e)(2).

Here, the ALJ did not accord controlling weight to Dr. Kukin's opinion because she found that the opinion was inconsistent with substantial evidence.[4] According to the ALJ, this substantial evidence consisted of the opinion of Dr. Caiati, the results of the stress test conducted by Dr. Yao, and Dr. Kukin's classification of plaintiff as being NYHA Class II. (Admin. Tr. at 18.) The court finds that neither the opinion of Dr. Caiati nor the results of Dr. Yao's stress test constitute the substantial evidence necessary to deny controlling weight to Dr. Kukin's opinion. Furthermore, the ALJ failed to request additional information from Dr. Kukin regarding his classification of plaintiff as being NYHA Class II, and thus, did not discharge her affirmative obligation to develop the administrative record.

The court finds Dr. Caiati's opinion unreliable. His conclusion that plaintiff's ability to sit, stand, walk, push, pull, and lift is "unrestricted" is belied by the stress test that he performed, the conclusions of the SSA's medical consultant, and the ALJ's conclusions. During the treadmill test, plaintiff was unable walk beyond three minutes at 1.7 miles per hour. (*Id*. at 196.) When Dr. Caiati terminated the test after three minutes, plaintiff had not yet reached the target heart rate. (*Id*.) Both the ALJ and the medical consultant rejected Dr. Caiati's opinion that plaintiff's ability to sit, stand, walk, push, pull, and lift is "unrestricted" because they found that plaintiff was only capable of light

---

[4] The ALJ did not rule that Dr. Kukin failed to support his conclusions with sufficient clinical evidence. Even if that was the case, however, rather than rejecting Dr. Kukin's opinion or declining to confer it controlling weight, the ALJ should have asked for such additional information. *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998). The ALJ did not do this.

work. (*Id*. at 17-18, 217.) Despite this rejection, the ALJ incredibly considered Dr. Caiati's opinion reliable enough to discredit the opinion of Dr. Kukin. In short, the ALJ relied on those portions of Dr. Caiati's report that were consistent with her own conclusions, but ignored those that were not. Such an inconsistent use of Dr. Caiati's report undermines the court's confidence in the ALJ's assessments of the medical opinions. *See Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) (finding that the inconsistent use of medical evidence undermines the ALJ's evaluation on the reliability of that evidence); *Ruggireo v. Astrue*, 5:05-CV-1179, 2008 WL 4518905, at *16 (W.D.N.Y. Sept. 30, 2008) ("The ALJ's selective reliance on only portions of Dr. Cunningham's opinions further undermines the RFC analysis."); *Watson v. Callahan*, 97 Civ 1398, 1997 WL 746455, at *13 (S.D.N.Y. Dec. 2, 1997) ("To allow the ALJ to rely on one portion of a doctor's report in support of his finding of no disability but then discount another portion of the very same report . . . would be inconsistent."). Moreover, the inconsistencies between Dr. Caiati's opinion on the one hand, and the results of his stress test as well as the opinions of the ALJ and medical examiner on the other hand, cast considerable doubt as to the reliability of Dr. Caiati's opinion.

The result of the treadmill stress test conducted by Dr. Yao, by itself, does not constitute substantial evidence. The Second Circuit warned of the unreliability of treadmill stress tests, emphasizing that it "results in misdiagnosis of ischemic heart disease on more than one third of the occasions." *See State of New York v. Sullivan*, 906 F.2d 910, 914 (2d Cir. 1990). The court explained that such false assessments may occur "because treadmill testing does not consider the full range of stresses and exertions that arise in the workplace or daily living." *Id*. (citing American College of Cardiology, *Insurability and Employability of the Patient with Ischemic Heart Disease*,

14 J. Amer. Coll. Card. 1003, 1033 (1989)).

The only remaining basis that the ALJ gave for discounting Dr. Kukin's opinion is the perceived inconsistency between the doctor's assessment that plaintiff has a less than sedentary residual functional capacity and the doctor's classification of the plaintiff as NYHA Class II. (Admin. Tr. at 18.) The ALJ cited to a definition of NYHA Class II that refers to "patients with slight or mild limitation of activity, they are comfortable with rest or mild exertion." (*Id*.) Plaintiff argues that the ALJ relied on the wrong definition. According to plaintiff, the correct NYHA Class II definition, which is found on the American Heart Association's website, is consistent with Dr. Kukin's assessment. (Doc. 11 at 16-18.) This classification refers to patients "with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. *Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain*." (*Id*. at 17-18) (emphasis added). Plaintiff believes that the additional emphasized statement makes this NYHA II classification "quite different from that relied upon by the Commissioner." (*Id*. at 18.) Plaintiff further emphasizes that a "person who experiences fatigue with ordinary physical activity is classified at stage II . . . [and] [t]hat is precisely the finding that Dr. Kukin made for Mr. McGowan." (*Id*.) Thus, plaintiff argues, the ALJ erred in finding that Dr. Kukin's overall assessment of residual capacity is at odds with the NYHA II classification.

This apparent inconsistency between Dr. Kukin's assessment of disability and his classification of the plaintiff as NYHA II, and the ALJ's assessment does not relieve the ALJ of her affirmative obligation to seek clarifying information from Dr. Kukin. *See Clark*, 143 F.3d at 118. Quite to the contrary, the Second Circuit has vacated and remanded when the ALJ failed "to seek out clarifying information concerning perceived inconsistencies between [the treating physician's]

two reports." *Id.* (internal quotation marks omitted). There is no evidence that the ALJ even attempted to obtain such information or that the ALJ had reason to believe that Dr. Kukin would have been unwilling to provide it. Consequently, the ALJ improperly discounted the conclusions of Dr. Kukin.

### 2. Plaintiff's Testimony Regarding His Symptoms

Plaintiff testified that his heart condition leaves him severely fatigued after minor exertion, and he requires daily naps. Although the ALJ found that "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," she nevertheless rejected his complaints as "not entirely credible." (Admin. Tr. at 18-19.) The ALJ does not explicitly explain why she did not believe plaintiff. (*Id.*) The Commissioner nevertheless argues that the ALJ's credibility finding was justified in light of plaintiff's "very functional" daily lifestyle and the objective medical evidence, both of which contradict his allegations of severe limitations. (Doc. 9 at 12-13.) The court finds that neither plaintiff's lifestyle nor the objective medical evidence provides sufficient grounds for disbelieving plaintiff's testimony about his symptoms.

The ALJ's only assessment of plaintiff's lifestyle is that "[s]uch a level of activity is inconsistent with assertions of *total* disability." (Admin. Tr. at 18. (emphasis added).) It is well established, however, that a claimant does not need to be totally disabled in order to be found disabled under the Social Security Act. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1992). Here, plaintiff does not claim that he is totally disabled. Rather, he alleges that minor exertion causes severe fatigue and that he requires a daily nap. The evidence of his lifestyle is not inconsistent with these limitations. This evidence, which sheds light on the quality and frequency of plaintiff's day-to-day activities, highlight, rather than undermine, the severity of his limitations.

Plaintiff's ability to care for himself is quite limited. His wife does almost all of the household work and he limits himself to very light chores such as changing light bulbs and sweeping leaves off of his steps. (*Id.* at 101, 285-86.) When he cooks, he only prepares simple meals, such as sandwiches, cereals, and soups, once or twice a week. (*Id.* at 100.) His wife does almost all of the shopping. (*Id.* at 285.) His shopping is limited to small items, such as clothing and medicine, which he purchases by mail, phone, or the internet. (*Id.* at 284.) When he goes to stores, he accompanies his wife in a car and stays in the car. (*Id.* at 285.)

The ALJ cites no evidence to support her assertion that plaintiff is "fully independent in all aspects of his health care . . . ." (Admin. Tr. at 18.) Quite to the contrary, plaintiff testified that taking care of his personal needs "causes fatigue, pain and discomfort and is very time consuming." (*Id.* at 113.) The ALJ also has not explained why plaintiff's social activities are inconsistent with his alleged disabilities. He uses email and the phone, and receives visits from friends and family. (*Id.* at 103.) He attends church, social groups, and meetings weekly. (*Id.*) He occasionally goes out to a restaurant with his family. (*Id.* at 287.) There is no evidence that the frequency of or the minor level of exertion required to attend these social activities would prevent someone with plaintiff's disability from participating.

The court finds nothing in the record indicating that the demands of plaintiff's doctoral dissertation and consulting work was greater than his disabilities permitted. Even though he completed his doctoral requirements in 2004, nearly all of the work was completed while plaintiff was still with the NYPD. (*Id.* at 285-86.) After he retired from the NYPD, plaintiff did minimal consulting work through the mail, and reviewed and edited lessons plans—all work that he could do at home. (*Id.* at 293.) There is no evidence that any of these activities required plaintiff to work

an eight-hour day, five days a week, and forgo his daily nap.

According to the Commissioner, in addition to plaintiff's daily activities, the ALJ's decision to reject the plaintiff's testimony is justified because "the objective clinical medical evidence is in no way compatible with contentions of substantial functional compromise of a cardiac nature." (*Id.* at 18., Doc. 9 at 13.) "[I]f objective medical evidence is not[, however,] sufficient to support a claimant's subjective allegations, the ALJ is required to consider various factors, including the claimant's daily activities, the frequency and intensity of [the symptoms], the type, dosage, effectiveness, and side effects of medication, and other treatment that relieves the [symptoms]." *Jordan v. Barnhart*, 01-6181, 2002 WL 448643, at *4 (2d Cir. Mar. 22, 2002) (citing 20 C.F.R. § 416.929(c)(3)). As previously explained, the conclusion that the ALJ draws from the evidence of plaintiff's daily activities is unsupported, and at times, runs contrary to the evidence in the record. This evidence supports, or at least is not inconsistent with, plaintiff's disability claims. The ALJ does not provide any meaningful discussion of the other factors in connection with her credibility finding. Furthermore, the ALJ's finding that the objective clinical medical evidence is "in no way compatible" with plaintiff's symptoms is belied by her own concession that "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . ." (*Id.*) In sum, the ALJ inappropriately rejected plaintiff's testimony about his symptoms.

### 3.    Ability to Perform Past Relevant Work

The fourth step of the disability analysis requires the ALJ to determine whether the claimant is capable of performing past relevant work. 20 C.F.R. § 416.920(f). In order for a claimant to demonstrate inability to perform past relevant work, "the claimant has the burden to show an

inability to return to her previous specific job *and* an inability to perform her past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original).  Put differently, the claimant must show that he is unable to engage in the *type* of work previously performed, and not simply an inability to carry out the particular responsibilities of her prior job. *See Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981); *Tappan v. Halter*, 10 Fed. Appx. 30, 32 (2d Cir. 2001) (citations omitted).

Here, the ALJ decided that plaintiff was able to perform his past relevant work because she believed that such work only required light exertion. (Admin. Tr. at 19.)  She disregarded plaintiff's explanation that his prior job required medium exertion, occasionally lifting and carrying about fifty pounds and frequently lifting and carrying about twenty-five pounds of equipment.  (*Id.*)  The ALJ justified this decision by citing to the DOT job descriptions for "Police Lieutenant, Patrol (government services)" and "Police Lieutenant, Community Relations (government services)." (*Id.* 9 citing U.S. Department of Labor, DOT codes 375.167-038 and 375.137-018).)  According to the DOT, these jobs are generally performed at the light exertional level within the general economy. (*Id.*)  In order to use these jobs as benchmarks for step four of the disability analysis, however, the ALJ must first conclude that they involve the same type of work as that performed by a police lieutenant in charge of hostage negotiations.  *See Jock*, 651 F.2d at 135; *Tappan*, 10 Fed.Appx. at 32 (citations omitted).

The court fails to see how the work performed by a police lieutenant responsible for hostage negotiations is the same as the type of work performed by a police lieutenant responsible for community relations or patrols.  Neither the ALJ nor the Commissioner provided such an explanation.  In fact, the only similarity among the three jobs that the ALJ noted is the fact that all

three job descriptions are for individuals carrying the same rank (lieutenant) in the same organization (police). Step four of the disability analysis, however, focuses on the substance of the prior work and not simply the formal title. *See Jock*, 651 F.2d at 135. Grouping jobs together as the same type of work simply because they carry the same rank within the same organization would produce absurd results in disability proceedings. For example, it makes no sense to use the type of work generally performed by a Navy Lieutenant for the Judge Advocate General as a benchmark to evaluate whether a Navy Lieutenant who served as a fighter pilot could perform his past relevant work. An attorney does not perform the same type of work as a combat aviator even if both are lieutenants in the U.S. Navy.

The DOT job descriptions for the various police lieutenants should have alerted the ALJ to the fact that not all police officers who hold the rank of lieutenant perform the same type of work. According to the DOT, police lieutenants for community relations engage primarily in outreach activities such as speaking at local functions and coordinating social events. *See* DOT Code 375.137-018. The responsibilities of police lieutenants in patrol units are largely ministerial, such as conducting roll call, relaying orders, conducting performance reviews, and inspecting various records. Much of this work is done at the precinct. *See* DOT Code 375.167-038. Whereas these two jobs involve primarily community outreach and ministerial duties, a lieutenant in other squads may have to conduct police raids and investigate homicides. *See* DOT Codes 375.167-010, 375.167-022.

Attempting to rescue hostages is undoubtedly distinguishable from community outreach or ministerial duties. The stress level and physical exertion required is much greater for a hostage rescuer. Plaintiff described his job as requiring him to report quickly to hostage-taking scenes,

where he directs the hostage-rescue effort. He may be required to wear a bullet proof vest and helmet and carry other equipment weighing up to fifty pounds. The angst produced in the life or death outcome of any given situation, by even common sense standards, would create especially harmful stressful effects on someone with a heart condition such as plaintiff. In evaluating whether plaintiff is capable of performing his past relevant work, the ALJ should have looked at how police lieutenants commanding hostage negotiations generally perform their jobs in the national economy. There is no evidence that the ALJ made any such effort. Accordingly, the ALJ had no basis to rule that plaintiff could perform his past relevant work.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is denied. Plaintiff's cross-motion is granted to the extent that this case is remanded to the Commissioner for further administrative proceedings consistent with this order.

SO ORDERED

DATED:      Brooklyn, New York
            March 23, 2009


_____/s/_____
DORA L. IRIZARRY
United States District Judge